UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR PUBLICATION

IN RE PAYMENT CARD INTERCHANGE
FEE AND MERCHANT DISCOUNT
ANTITRUST LITIGATION

MEMORANDUM
AND ORDER
05-MD-1720 (JG) (JO)

A P P E A R A N C E S

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

ROBINS, KAPLAN, MILLER & CIRESI L.L.P
2800 LaSalle Plaza
800 LaSalle Avenue South
Minneapolis, MN 55402

BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103

*Co-Lead Counsel for Class Plaintiffs*

KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard, Suite 1100
Miami, FL 33131

SPERLING & SLATER
55 West Monroe Street, Suite 3200
Chicago, IL 60603

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
30 North Third Street
Harrisburg, PA 17101

*Counsel for the Individual Plaintiffs*

ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022

HOLWELL SHUSTER & GOLDBERG LLP
125 Broad Street, 39th Floor
New York, NY 10004

*Attorneys for Defendant Visa U.S.A. Inc.*

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006

*Attorneys for Defendant MasterCard
International Incorporated*

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10104

*Attorneys for Defendant Bank of America*

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022

*Attorneys for Defendant Barclays Bank*

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036

*Attorneys for Defendant Capital One Bank (USA)*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036

*Attorneys for Defendant JPMorgan Chase & Co.*

SIDLEY AUSTIN LLP
1 South Dearborn Street
Chicago, IL 60603

*Attorneys for Defendant Citibank, N.A.*

KEATING MUETHING & KLEKAMP PLL
1 East Fourth Street, Suite 1400
Cincinnati, OH 45202

*Attorneys for Defendant Fifth Third Bancorp*

KUTAK ROCK LLP
1650 Farnam Street
Omaha, NE 68102

*Attorneys for Defendant First National Bank of Omaha*

WILMERHALE
7 World Trade Center, 250 Greenwich Street
New York, NY 10007

*Attorneys for Defendant HSBC Finance Corporation*

JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001

*Attorneys for Defendant National City Corporation*

PULLMAN & COMLEY, LLC
850 Main Street
Bridgeport, CT 06601

*Attorneys for Defendant Texas Independent Bancshares, Inc.*

ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309

*Attorneys for Defendant SunTrust Banks, Inc.*

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036

*Attorneys for Defendant Wachovia Bank, NA.*

FRIEDMAN LAW GROUP LLP
270 Lafayette Street
Suite 1410
New York, NY 10012

*Attorneys for Plaintiffs in No. 05-cv-5074*

FREEDMAN BOYD DANIELS
HOLLANDER GOLDBERG & CLINE,
P.A.
P.O. Box 25326, 20 First Plaza, Suite 700
Albuquerque, NM 87102

*Attorneys for Plaintiffs in No. 05-cv-5075*

CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, NY 10017

*Attorneys for Plaintiff NATSO, Inc.*

QUINN EMANUEL
51 Madison Avenue, 22nd Floor
New York, NY 10010

*Attorneys for Objector Home Depot U.S.A., Inc.*

VORYS, SATER, SEYMOUR AND PEASE
LLP
52 East Gay Street
Columbus, OH 43215

*Attorneys for Objector Target Corporation*

EMERY, CELLI, BRINCKERHOFF &
ABADY LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019

*Attorneys for Objector National Retail Federation*

SCHLAM, STONE & DOLAN, LLP
26 Broadway, 19th Floor
New York, NY 10004

*Attorneys for Amicus Curiae U.S. Public Research Interest Group*

PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA 94111

*Attorneys for Objector First Data Corporation*

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, Seventh Floor
New York, NY 10022

*Attorneys for Objector American Express Co.*

KIRKLAND & ELLIS
153 East 53rd Street
New York, NY 10022

*Attorneys for Objector Discover Financial Services*

iii

MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, NW, Suite 900
Washington, DC 20005

*Attorneys for Objector Blue Cross Blue Shield Entities*

LAW OFFICES OF EDWARD F. SIEGEL
705 South Alton Way #1C
Denver, CO 80247

*Attorneys for Objector Vicente Consulting LLC*

JOSHUA R. FURMAN LAW CORP.
15260 Ventura Boulevard, Suite 2250
Sherman Oaks, CA 91403

*Attorneys for Objector Jon M. Zimmerman*

OHIO ATTORNEY GENERAL MIKE DeWINE
150 East Gay Street, 23rd Floor
Columbus, OH 43215

*Attorney for Objector State of Ohio*

THE LAW OFFICES OF JOHN J. PENTZ
19 Widow Rites Lane
Sudbury, MA 01776

*Attorneys for Defendant Daviss Donuts and Deli*

THRASH LAW FIRM, P.A.
1101 Garland Street
Little Rock, AR 72201

*Attorneys for R&M Objectors*

STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

*Attorney for Objector State of California*

iv

CONTENTS

A.    Preliminary Statement ................................................................................... 2

    1.    Structure of a Credit Card Transaction; Interchange Fees ................................. 2

    2.    The Default Interchange Rule; Honor-all-Cards Rules; Anti-Steering Rules .... 3

    3.    The Course of the Litigation; Industry Changes Occurring During the Litigation; and the Proposed Settlement ............................................................. 4

    4.    Overview of Reasons for Approval .................................................................. 8

B.    The Claims in the Case ............................................................................... 13

C.    The Standard for Approving a Proposed Settlement ........................................ 14

    1.    Procedural Fairness ....................................................................................... 15

    2.    Substantive Fairness ...................................................................................... 17

        a.    The Complexity, Expense, and Likely Duration of the Litigation ............... 17

        b.    The Reaction of the Class to the Settlement .................................................. 18

        c.    The Stage of the Proceedings and the Amount of Discovery Completed..... 20

        d.    The Risks of Establishing Liability and Damages, and of Maintaining the Class Action through the Trial ....................................................................... 20

        e.    The Ability of Defendants to Withstand a Greater Judgment...................... 29

        f.    The Range of Reasonableness of the Settlement Fund in Light of the Possible Recovery and Attendant Risks of Litigation................................................. 29

D.    The Objections .......................................................................................... 31

    1.    Rule Reforms .............................................................................................. 31

        a.    The Elimination of the Networks' No-Surcharge Rules.............................. 31

        b.    The Buying Group Provision ....................................................................... 38

    2.    The Releases ................................................................................................ 39

    3.    The Health Insurers' Objections ................................................................... 42

    4.    Claims by States Acting in their Sovereign Capacity ...................................... 43

    5.    Discover's Objection .................................................................................... 45

    6.    The Notice to Class ..................................................................................... 45

    7.    Cohesiveness of the Rule 23(b)(2) Class; Adequacy of Class Plaintiffs .......... 46

E.    The Plan of Allocation ................................................................................ 48

JOHN GLEESON, United States District Judge:

In this antitrust action, a putative class of approximately 12 million merchants alleges that, among other things, defendants Visa U.S.A. Inc. ("Visa") and MasterCard International Incorporated ("MasterCard"), as well as issuing and acquiring banks (collectively the "defendants"), conspired to fix interchange fees in violation of Section 1 of the Sherman Act.

Before me now is a motion by Class Plaintiffs,[1] certain other plaintiffs who are not members of the class (referred to throughout the case and in this opinion as the "Individual Plaintiffs"[2]), and the defendants for final approval of a proposed settlement.  In essence, the settlement calls for (1) a cash recovery slightly in excess of $7 billion (before reductions for opt-outs) by members of a Rule 23(b)(3) class; and (2) certain reforms of the defendants' rules and practices to benefit the members of a Rule 23(b)(2) class.  SA ¶¶ 33, 68.[3]  They also seek

---

[1]      "Class Plaintiffs" refers to proposed class representative merchants Photos Etc. Corp.; Traditions, Ltd.; Capital Audio Electronics, Inc.; CHS Inc.; Crystal Rock LLC; Discount Optics, Inc.; Leon's Transmission Service, Inc.; Parkway Corp.; and Payless ShoeSource, Inc.

[2]      The Individual Plaintiffs are: Ahold U.S.A., Inc.; Albertsons LLC; Albertson's, Inc.; BI-LO, LLC; Delhaize America, Inc.; Eckerd Corporation; The Great Atlantic & Pacific Tea Company; H.E. Butt Grocery Company; Hy-Vee, Inc.; The Kroger Co.; Maxi Drug, Inc. (and doing business as Brooks Pharmacy); Meijer, Inc.; Meijer Stores Limited Partnership; Pathmark Stores, Inc.; QVC, Inc.; Raley's; Rite Aid Corporation; Safeway Inc.; SuperValu Inc.; and Walgreen Co.

[3]      Citations in the form "SA ¶ __" refer to the paragraphs of the proposed settlement agreement, which is titled "Definitive Class Settlement Agreement."  It is located at docket entry 1656-1 and referred to here as the "Settlement Agreement."  The Rule 23(b)(3) class is defined at SA ¶ 2(a) as follows:

> A "Rule 23(b)(3) Settlement Class" under Federal Rules of Civil Procedure 23(a) and (b)(3), from which exclusions shall be permitted, consisting of all persons, businesses, and other entities that have accepted Visa-Branded Cards and/or MasterCard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date, except that this Class does not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time from January 1, 2004 to the Settlement Preliminary Approval Date, or the United States government.

The Rule 23(b)(2) class is defined at SA ¶ 2(b)as follows:

> A "Rule 23(b)(2) Settlement Class" under Federal Rules of Civil Procedure 23(a) and (b)(2), from which exclusions shall not be permitted, consisting of all persons, businesses, and other entities that as of the Settlement Preliminary

1

approval of the proposed plan of allocation of the settlement fund, and Class Counsel[4] seeks attorneys' fees and costs.

I held a fairness hearing on September 12, 2013, at which there was extensive oral argument in support of and in opposition to the proposed settlement.

For the reasons discussed below, I approve the proposed settlement and the plan of allocation. The motion for fees and costs will be decided separately.

A.  *Preliminary Statement*

1.      *Structure of a Credit Card Transaction; Interchange Fees*

A Visa or MasterCard credit card transaction involves five parties: (1) the customer; (2) the merchant; (3) the "acquiring bank"; (4) the "issuing bank"; and (5) the network itself, that is, Visa or MasterCard. The acquiring bank is the link between the network and the merchant that accepts the card for payment. The issuing bank is the bank that issued the credit card to the customer. When the cardholding customer presents a credit card to pay for goods or services, the accepting merchant relays the transaction information to the acquiring bank. The acquiring bank processes the information and transmits it to the network. The network relays the information to the issuing bank, which approves the transaction if doing so is consistent with the cardholder's account status and credit limit. The approval is conveyed to the acquiring bank, which in turn relays it to the merchant.

The issuing bank then transmits to the acquiring bank the amount of the purchase price minus the "interchange fee."[5] The acquiring bank withholds an additional fee – called the

---

Approval Date or in the future accept any Visa-Branded Cards and/or MasterCard-Branded Cards in the United States, except that this Class shall not include the named Defendants, their directors, officers, or members of their families, financial institutions that have issued Visa- or MasterCard-Branded Cards or acquired Visa- or MasterCard-Branded Card transactions at any time since January 1, 2004, or do so in the future, or the United States government.

[4]      "Class Counsel" refers to the three firms appointed co-lead counsel for Class Plaintiffs: Robbins Geller Rudman & Dowd LLP; Robins, Kaplan, Miller & Ciresi L.L.P.; and Berger & Montague, P.C.

"merchant discount fee" – for its processing services.  Thus, the total amount the merchant

receives for the transaction is the purchase price minus the sum of the interchange fee and the

merchant discount fee.

Interchange fees vary based on factors that include the type of card used and the

type of merchant.  Many Visa and MasterCard credit cards provide rewards to the cardholders.

Those rewards cost money, and thus these cards, referred to in the industry and here as "premium

cards," are associated with higher interchange fees.

2.    *The Default Interchange Rule; Honor-all-Cards Rules; Anti-Steering Rules*

The competitive problem that gave rise to this case, according to the plaintiffs, is

the result of a combination of network rules. The Honor-all-Cards rules require merchants who

accept *any* Visa- or MasterCard-branded credit cards to accept *all* cards of that brand, no matter

what bank may have issued them and no matter the interchange fee.  The Honor-all-Cards rules

created what the merchants term the "hold-up problem."  Unlike checks, which are redeemed by

the drawee banks "at par," that is, without the drawee bank charging a fee for acceptance, the

issuing bank of a Visa or MasterCard credit card is free to demand whatever interchange fee it

chooses ("hold-up") in order to accept the transaction from the merchant who is required to

accept the card.

As the merchants describe them, the default interchange rules are the networks'

"solution" to the hold-up problem.  Those rules establish mandatory interchange fees that apply

to every transaction on the network unless the merchant and the issuing bank have entered into a

bilateral interchange agreement.  However, the merchants complain that the combination of the

Honor-all-Cards rules and the anti-steering rules, which are discussed further below, strips the

---

[5]    The interchange fee can be a flat fee, a percentage of the transaction price, or a combination of the two.

issuing banks of any incentive to accept interchange fees lower than the default interchange fees. And obviously merchants have no incentive to negotiate a *higher* interchange fee. Thus "default interchange," the merchants assert, becomes a fixed rate that applies to every credit card transaction (with the narrow exception of transactions by very large merchants who have sufficient volume that they can negotiate their own private interchange fees).

A linchpin to the problem, as far as the merchants are concerned, is the package of anti-steering restraints that prohibit merchants from using price signals at the point of sale to steer customers to less costly forms of payment. The no-surcharge rules prohibit merchants from adding a surcharge to a transaction involving either of the networks' credit cards. Thus, a merchant who must pay a 2% interchange fee upon accepting a Visa or MasterCard credit card is prohibited from adding a 2% surcharge (or any surcharge at all) to either discourage the use of that card or to recoup the cost of acceptance. Similarly, until recently (as discussed further below), no-discount rules prohibited merchants from offering price discounts at the point of sale. There are other components to the networks' anti-steering regimes, some of which are mentioned below. In the aggregate, these essentially identical regimes prohibit merchants from informing customers about higher-cost payment cards, incentivizing customers to use lower-cost cards or other forms of payment, or recouping the acceptance costs of the cards the merchants are required to honor.

   3.    *The Course of the Litigation; Industry Changes Occurring During the Litigation; and the Proposed Settlement*

This case has been extensively litigated for more than eight years. Discovery, which began in 2005, included more than 400 depositions, the production and review of more than 80 million pages of documents, the exchange of 17 expert reports, and a full 32 days of expert deposition testimony.

While the case has been pending, there have been significant developments in the industry, some of which are attributable in whole or in part to the case itself. The very structures of Visa and MasterCard themselves changed; in 2008 and 2006, respectively, initial public offerings ("IPOs") converted each from a consortium of competitor banks into single-entity, publicly traded companies with no bank governance.

In addition, federal legislation – the so-called "Durbin Amendment" – in 2010 removed the networks' restrictions on discounting credit and debit cards at the network level. Thus, Visa, MasterCard, American Express and Discover can no longer prohibit merchants from discounting their cards.[6] The Durbin Amendment did not change the networks' rules prohibiting surcharging.

In 2010, after an investigation assisted by the information developed by the plaintiffs here, the Department of Justice ("DOJ") filed lawsuits against Visa, MasterCard and American Express. In consent decrees filed in 2011, Visa and MasterCard agreed to remove their rules prohibiting merchants from product-level discounting of credit and debit cards. Again, the resolution of that case against these defendants did not affect the surcharging prohibitions.

By 2011, several significant motions had been briefed and were ripe for decision, including a motion to certify classes,[7] a motion to dismiss supplemental complaints arising out of the IPOs, and cross-motions for summary judgment.

---

[6]     The Durbin Amendment was part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. 111-203, 124 Stat. 1376; it is codified at 15 U.S.C. § 1693o-2(b)(3)(A)(i). The Amendment did not allow for product-level discounting, by which a merchant could choose to discount a particular card type.

[7]     The motion sought to certify an injunctive relief class (the "(b)(2)" class), and a damages class (the "(b)(3)" class). *See* Fed. R. Civ. P. 23(b)(2) & (3).

Even as they litigated the case full-throttle, beginning in 2008 the parties engaged in efforts to settle their disputes.  They participated in mediation sessions with the Honorable Edward A. Infante (Ret.) and, beginning in 2009, with Professor Eric D. Green as well.  The parties had dozens of meetings and conference calls with the mediators over the next several years.

On November 2, 2011, I held oral argument on, *inter alia*, the parties' cross-motions for summary judgment.  *See* DE 1560.[8]  Even before that argument, however, the parties requested through the mediators that any decision on those motions and on the motion for class certification be withheld pending settlement discussions with the Court itself.[9]

On Friday and Saturday, December 2 and 3, 2011, at the express request of all parties, Judge Orenstein and I engaged in lengthy settlement discussions with the parties and the mediators.  The ground rules were made clear and were agreed to on the record at the outset.  In an effort to foster as much candor and engagement as possible, all parties consented to *ex parte*, off-the-record discussions about all of the various issues that required resolution before the case could be settled.  It was a process that had proven useful in a successful effort to settle a previous antitrust class action against Visa and MasterCard.  *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005).  Indeed, several of the participants in the settlement discussions in this case had been involved in those other settlement talks ten years earlier.

The settlement discussions on December 2 and 3, 2011 were productive.  They illuminated the parties' positions and concerns regarding the merits of the plaintiffs' claims, the

---

[8]      Citations in the form "DE __" refer to docket entries in this case.

[9]      In the context of settlement discussions, my use of the term "Court" in this opinion refers to both me and Magistrate Judge James Orenstein, who has worked tirelessly and effectively throughout this litigation and was my partner in attempting to help the parties reach a consensual resolution of the case.

defendants' defenses, the purposes and effects of the challenged rules, and the various ways in which the rules might be changed by agreement to inject competition into the setting of interchange fees for Visa and MasterCard credit cards.

After a third meeting with Judge Orenstein and me on December 15, 2011, the parties resumed discussions with the mediators. On February 21, 2012, those discussions resulted in an acceptance by all of the defendants and all of the named plaintiffs of the terms of a mediators' proposal. When the efforts to reduce the agreed-upon terms of that proposal to a settlement agreement stalled, the parties once again sought and obtained the assistance of the Court. On June 20 and 21, 2012, additional settlement discussions occurred in chambers pursuant to the same terms and consent that had governed the discussions six months earlier. At the conclusion of those two days of discussions, the parties informed the Court that they had reached agreement on all of the issues necessary to settle the case.

On July 13, 2012, the parties filed a Memorandum of Understanding attaching a document setting forth the terms of the settlement. *See* DE 1588. In October 2012, after completing the drafting of related documents, including escrow agreements and a Plan of Administration and Distribution, the parties executed the Settlement Agreement. *See* DE 1656. On October 19, 2012, Class Counsel moved for preliminary approval of the proposed settlement, which I granted on November 27, 2012. The order granting preliminary approval provisionally certified classes under Rule 23(b)(2) and (b)(3). The Class Administrator notified class members of the terms of the proposed settlement through a mailed notice and publication campaign that included more than 20 million mailings and publication in more than 400 publications. The notice plan was carried out between January 29, 2013 and February 22, 2013. Class members

had until May 28, 2013 to opt out of the damages class, object to the proposed settlement, or

both.

The proposed Settlement Agreement provides for, among other things:

- The creation of two cash funds totaling up to an estimated $7.25 billion (before reductions for opt-outs).  SA ¶¶ 9-10, 11-13.

- Visa and MasterCard rule modifications to permit merchants to surcharge on Visa- or MasterCard-branded credit card transactions at both the brand and product levels. SA ¶¶ 42, 55.

- An obligation on the part of Visa and MasterCard to negotiate interchange fees in good faith with merchant buying groups.  SA ¶¶ 43, 56.

- Authorization for merchants that operate multiple businesses under different "trade names" or "banners" to accept Visa and/or MasterCard at fewer than all of its businesses. SA ¶¶ 41, 54.

- The locking-in of the reforms in the Durbin Amendment and the DOJ consent decree with Visa and MasterCard, even if those reforms are repealed or otherwise undone.  SA ¶¶ 40, 44, 53, 57, Appendix J.

4.    *Overview of Reasons for Approval*

As class action settlement proceedings go, this one has been anything but typical.

Some of the merchant plaintiffs who directly participated in the lengthy settlement discussions

and initially agreed to the terms of the settlement broke away and objected, as they were entitled

to do.  Numerous other members of the merchant class have objected as well, on a variety of

grounds.

The behavior of a small number of objectors has threatened to undermine the

efforts of the others.  Specifically, in their zeal to drum up objections and opt-outs by merchants

around the country, certain merchant groups established websites that spread false and

misleading information about the settlement and the merchants' options.  In April of this year I

8

had to order injunctive relief to remedy that situation; in May I came close to holding certain entities in contempt of that injunction.

The oral presentations of the objectors at the fairness hearing were afflicted by needless hyperbole. One of the merchant association principals who participated in the settlement discussions and initially agreed to its terms argued that the members of his association would be worse off if I approved the proposed settlement than they would be if they proceeded all the way through trial and *lost.* Another likened the prospect of approval to the deprivation of civil liberties in the aftermath of a terrorist attack, warning that only a "slippery slope" would separate an order binding a large retailer to the proposed settlement and the government stripping us of our houses and civil rights. A third cast Visa and MasterCard as modern-day Nazis, and warned me not to assume the role of Neville Chamberlain.

If only the issues here were that simple. But in reality the vitriol and poor behavior and feigned hysteria mask complex and difficult issues on which reasonable merchants can and do disagree. Some of those issues stem from the fact that a lawsuit is an imperfect vehicle for addressing the wrongs the plaintiffs allege in their complaint. For example, there are forms of relief many objectors seek, such as the regulation of interchange fees, that this Court could not order even if the plaintiffs obtained a complete victory on the merits. In addition, there are features of the industry landscape, such as other credit card issuers with whom the defendants compete, and laws in some states that prohibit merchants from surcharging the use of credit cards, that are beyond the reach of this case but will undermine (at least in the near term) the efficacy of the agreed-upon relief.

The proponents of the settlement disagree strongly with the objectors over the economic value of the proposed settlement to the class members, and specifically over the

9

benefits of the proposed rules changes to the merchant class.  As a result, I availed myself of the provisions in Rule 706 of the Federal Rules of Evidence allowing for court-appointed expert witnesses.  On April 8, 2013, I appointed Dr. Alan O. Sykes of New York University School of Law "to advise the Court with respect to any economic issues that may arise in connection with the forthcoming motion for final approval of the proposed settlement."[10]  Dr. Sykes filed a memorandum with the Court on August 28, 2013.[11]  It has proved quite helpful, and he has the gratitude of the Court.

Fortunately, well-established law provides a rubric for deciding the motion, and I engage below in the prescribed multifactor inquiry.  By way of overview, however, I conclude that the proposed settlement secures both a significant damage award and meaningful injunctive relief for a class of merchants that would face a substantial likelihood of securing no relief at all if this case were to proceed.

Specifically, although the settlement either obtains or locks in place an array of rules changes, at its heart is an important step forward: a rules change that will permit merchants to surcharge credit cards at both the brand level (*i.e.*, Visa or MasterCard) and at the product level (*i.e.*, different kinds of cards, such as consumer cards, commercial cards, premium cards, etc.), subject to acceptance cost and limits imposed by other networks' cards.  For the first time, merchants will be empowered to expose hidden bank fees to their customers, educate them about those fees, and use that information to influence their customers' choices of payment methods.  In short, the settlement gives merchants an opportunity at the point of sale to stimulate the sort of network price competition that can exert the downward pressure on interchange fees they seek.

---

[10]    DE 2807.  After consulting with the parties, *see* DE 5863, I issued a subsequent order establishing procedures for the parties to provide information to Dr. Sykes and to respond to his advice to the Court.  *See* DE 5873.

[11]    DE 5965.

Relief directed at the default interchange fees (even if such relief were available from a court as opposed to a legislature) would not share that characteristic. Both Visa and MasterCard have other elements to their fee structures. Relief aimed solely at the interchange fees would leave them free to recoup any associated lost revenues by tinkering with those other fees, and the merchant restraints would, in effect, place the merchants back where they started. By focusing on those restraints, the proposed settlement seeks to empower merchants to steer cardholders to lower-cost payment alternatives. The goal is to incentivize the networks to compete for the merchants' credit card volume through lower fees of all kinds, including interchange fees, and to allow merchants to recoup their costs when their efforts to steer customers to lower-cost means of payment do not succeed.

The objections to the proposed settlement are numerous, but in the main, they fail for one of two reasons. First, the objectors complain about the failure of the proposed settlement to eliminate other Visa and MasterCard rules, such as the default interchange and Honor-all-Cards rules. But those rules undeniably have significant procompetitive effects, and they lay at the heart of Visa's and MasterCard's efforts to build the successful networks they now have. Class Counsel have good reason to believe that even if the default interchange and the Honor-all-Cards rules are characterized as horizontal restraints (despite the IPOs), they will still receive only Rule-of-Reason antitrust scrutiny, which they could quite easily withstand. Perhaps most telling of all is that the Department of Justice, which recently conducted a thorough investigation of these networks' operating rules, declined even to challenge either rule. In short, it is hard to persuasively challenge a compromise on the ground that it fails to eliminate rules that even a complete success on the merits might not eliminate.

11

Second, the objectors complain about factors that they say will limit the usefulness of their newfound ability to surcharge credit cards that carry costly interchange fees. Those factors, which include the merchant restraints imposed by American Express and the laws prohibiting surcharging in approximately ten states, are real, and they in fact undermine to an extent the immediate utility of the rules reforms in the proposed settlement.  A merchant's ability to surcharge a particularly expensive Visa card is less valuable if the merchant remains unable because of American Express's merchant restraints to steer customers away from even higher-priced American Express cards.  Similarly, the option to surcharge that the proposed settlement affords merchants obviously cannot be exercised in states that now have anti-consumer no-surcharge laws.

But the virulent objections – based on those and other practical limitations on the relief the proposed settlement affords – fail to take sufficient account of the fact that, in the end and despite its outsized proportions, this is just an antitrust lawsuit.  Even if the plaintiffs spent several years pursuing this unwieldy case to a successful conclusion (despite substantial odds against such a result), this Court would be in no position to grant the sweeping relief the objectors seek.  It cannot regulate interchange fees or enjoin nonparties or preempt state laws or reform network rules that do not violate the antitrust laws.  The Sherman Act affords relief only from certain proven anticompetitive business practices.  And the agreed-upon relief here, which has the potential to unleash a new competitive force on interchange fees, falls squarely in the wheelhouse of what this lawsuit is all about.

The first Visa/MasterCard multi-district litigation broke the tie between credit and debit cards.  The Durbin Amendment removed discounting restrictions at the network level.  The consent decree in the government's case removed product-level discount restrictions.  The IPOs

12

wrested control of Visa and MasterCard from the banks. This proposed settlement adds another crucial reform – the lifting of restrictions on network- and product-level surcharging. Even if the objectors are right in contending that additional dominoes must fall before the alleged anticompetitive behavior of Visa and MasterCard is eradicated, those dominoes will have to fall in other forums. That does not alter the significance of the relief provided by the proposed settlement.

B.  *The Claims in the Case*

Beginning in June 2005, more than 40 class action complaints were filed by merchants against the defendants. The class actions were consolidated in 2005, together with 19 individual actions. The Court appointed Class Counsel as co-lead counsel and a consolidated amended complaint was filed on April 24, 2006. DE 317.[12]

As mentioned above, the plaintiffs allege that Visa and MasterCard adopted and enforced rules and practices relating to payment cards that had the combined effect of unreasonably restraining trade and injuring merchants. Those rules and practices include:

- Rules regarding the setting of default interchange fees. *See* Second Cons. Am. Class Action Compl.

- A number of "anti-steering" rules – including "no surcharge" rules, "no discounting" or "non-discrimination" rules, and "no minimum purchase" rules – that restrict merchants from steering customers to lower-cost credit cards and/or forms of payment other than Visa or MasterCard payment cards.

- A number of "exclusionary" rules – including "all outlets" rules, "no bypass" rules, and "no multi-issuer" rules – that restrict merchants in accepting and processing payments made with Visa and MasterCard cards.

---

[12]    Also in 2005, the Individual Plaintiffs, a group of large retailer merchants, filed lawsuits against Visa and MasterCard, making allegations narrower than those set forth in the class action complaints here. The Individual Plaintiffs alleged that merchant restraints in the networks' operating rules protected Visa and MasterCard from interbrand competition on the merchant side (as opposed to the bank side) of the market. Both sets of lawsuits – the class actions and the Individual Plaintiffs' complaints – were consolidated before me in this multidistrict litigation.

- "Honor-all-Cards" rules, which required merchants to accept all the network's credit cards or all the network's debit cards when proffered for payment, regardless of which bank issued the card.

Class Plaintiffs allege that these rules insulate the Visa and MasterCard networks from competition with each other, from other brands and from other forms of payment, allowing Visa and MasterCard and the issuing banks to set supracompetitive default interchange fees.

Class Plaintiffs allege that these rules were adopted pursuant to unlawful agreements among the banks and Visa, and among the banks and MasterCard. Specifically, they allege that the defendant banks were members of Visa or MasterCard and were represented on their boards, and thus determined the networks' rules and practices. Class Plaintiffs allege that the banks owned and effectively operated Visa and MasterCard, such that Visa and MasterCard were unlawful "structural conspiracies" or "walking conspiracies" with respect to their network rules and practices. Class Plaintiffs further allege that after the Visa and MasterCard IPOs, the unlawful agreements among the banks and Visa, and among the banks and MasterCard, continued.

Based on these allegations, Class Plaintiffs seek damages to compensate merchants for supracompetitive default interchange fees in the past. They also seek injunctive relief to restructure the networks' rules and practices in the future.

C. *The Standard for Approving a Proposed Settlement*

Pursuant to Federal Rule of Civil Procedure 23(e), any settlement of a class action requires court approval. A court may approve such a settlement if it is "fair, adequate, and reasonable, and not a product of collusion." *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000). In so doing, the court must "eschew any rubber stamp approval" yet simultaneously "stop short of the detailed and thorough investigation that it would undertake if it were actually trying

14

the case." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000). Judicial discretion is informed by the general policy favoring settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also Denney v. Jenkins & Gilchrist*, 230 F.R.D. 317, 328 (S.D.N.Y. 2005) ("There is a strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy.") (footnotes, citations and internal quotation marks omitted), *aff'd in part and vacated in part*, 443 F.3d 253 (2d Cir. 2006).

　　　　To evaluate whether a class settlement is fair, a district court examines (1) the negotiations that led up to the settlement, and (2) the substantive terms of the settlement. *See In re Holocaust Victims Assets Litigation*, 105 F. Supp. 2d 139, 145 (E.D.N.Y. 2000). In evaluating procedural fairness, "[t]he [negotiation] process must be examined 'in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves.'" *Id*. at 145-46 (quoting *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983)). Factors relevant to the substantive fairness of a proposed settlement include: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *See Grinnell*, 495 F.2d at 463.

　　　　1.　　*Procedural Fairness*

15

The proposed settlement is the product of arm's-length negotiations between experienced and able counsel on all sides. The lawyers for the parties spent a great deal of time in face-to-face, telephonic and written negotiations.  Those negotiations were assisted by two eminent mediators, Judge Infante and Professor Green, who have informed the Court that the settlement negotiations were fair and conducted at arm's length.  My own participation in the efforts to settle the case (along with Magistrate Judge Orenstein) confirmed those descriptions of the negotiations, and nothing in the record suggests otherwise.

The objecting plaintiffs argue from the fact that a number of class members and class representatives now oppose the settlement that the negotiations were not fair.  I do not find this argument persuasive.  A number of objectors were deeply involved in the settlement negotiations and mediation, and indeed accepted the mediators' proposal that outlined the key components of what became the Settlement Agreement.  Wildfang Supp. Decl., ¶ 29, DE 5939-1. Their current dissatisfaction with the terms of that agreement raises genuine issues of substantive fairness, but it does nothing to undermine a record that demonstrates beyond any reasonable doubt that the negotiations were adversarial and conducted at arm's length by extremely capable counsel.

Furthermore, there is no indication that the Settlement Agreement is the product of collusion or that it confers upon the class representatives or any other subset of the class "improper[] . . . preferential treatment."  *In re NASDAQ Market-Makers Antitrust Litigation*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).  The objecting plaintiffs argue that because Visa and MasterCard were able to negotiate jointly with Class Plaintiffs this may indicate collusion – specifically in regard to the revisions to the no-surcharging rules.  Again, I am not persuaded. Mediators and the Court were involved in the settlement negotiations.  The Second Circuit has

16

recognized that the involvement of a mediator in pre-certification settlement negotiations helps to ensure that the proceedings are free of collusion and undue pressure. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). In addition, as discussed more fully below, I conclude that the injunctive relief at the heart of the settlement inures equally to the benefit of every single member of the merchant class. Accordingly, I conclude that the negotiation process fairly protected the interests of the settlement class.

       2.    *Substantive Fairness*

           a.   *The Complexity, Expense, and Likely Duration of the Litigation*

       The potential for this litigation to consume considerable additional time and resources is great. The complexity of federal antitrust law is well known. *See, e.g., Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (noting the "factual complexities of antitrust cases"); *Weseley v. Spear, Leeds & Kellogg*, 711 F.Supp. 713, 719 (E.D.N.Y. 1989) (antitrust class actions "are notoriously complex, protracted, and bitterly fought"). Numerous motions remain pending before the Court, including motions to dismiss, summary judgment motions, *Daubert* motions, and a motion to certify both a damages class under Rule 23(b)(3) and an injunctive-relief class under Rule 23(b)(2). As to the class certification motion, the losing party would likely seek interlocutory review by the Second Circuit under Federal Rule of Civil Procedure 23(f) (review this Court would welcome and encourage), delaying the case substantially.[13] Class Counsel represent that a trial would take several months, and I have no doubt they are correct. The losing parties would likely appeal any adverse jury verdicts, thereby extending the duration of litigation. By contrast, the proposed

---

[13]      In the *Wal-Mart* case, twenty months elapsed between the order certifying the class and the Second Circuit's divided opinion affirming that decision. *See In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000), aff'd, *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 129 (2d Cir. 2001).

settlement allows class members to take advantage of rules changes now – those changes are already in place – and further provides for significant monetary compensation in the near future.

   b.  *The Reaction of the Class to the Settlement*

Class Counsel report that almost 21 million long-form notices were mailed. Taking into account duplicate mailings, and in light of various other factors that make the precise size of the class impossible to determine, Class Counsel estimate that approximately 12 million merchants comprise the class.  Only .05% of them have objected to the settlement, and 90% of the objections are on boilerplate forms downloaded from websites that disseminated false and misleading information for the precise purpose of drumming up objections and opt-outs.  It is thus difficult to ascribe significant weight to the bulk of the objections.

   On the other hand, because the roster of objectors includes some of the nation's largest retailers, the objectors in the aggregate represent 19% of the total transaction volume. Many of the named plaintiffs in the case are objectors.  Indeed, the motion for final approval has caused a rift among large United States retailers, all of whom agree that the current interchange fees are too high due to anticompetitive practices.

   The divisions among the major merchants run deep, but they are also nuanced. For example, of the top 60 merchants (measured by transaction volume) to opt out of the (b)(3) damages class, about half (27) have not *objected* to the settlement.  Thus, those merchants, which include almost all the major airlines, will seek to obtain a greater damage award from Visa and MasterCard, but they apparently see value in the (b)(2) relief.  And the conduct of the airlines is significant; in other markets that allow the surcharging permitted by the proposed settlement, airlines were among the first to adopt the practice, which has had the effect of moving

18

transactions to cheaper payment alternatives.  Thus, not all of the opt-outs evidence dissatisfaction with the rules changes in the proposed (b)(2) settlement.

Similarly, although some merchants have argued that the ability to surcharge is useless to smaller retailers, such as grocery stores and convenience stores, Class Counsel report that 15 of the top 25 convenience stores have not objected to the settlement, and 5 of those neither objected nor opted out.

In short, the reaction of the class to the proposed settlement is a mixed bag.  To paraphrase the argument by counsel for the Individual Plaintiffs at the fairness hearing, intelligent and thoughtful merchants with a common complaint, a common goal, and many other things in common part company on the degree to which the proposed settlement obtains for the merchant class what can reasonably be expected to be obtained in this case.

Given the transaction volume represented by the objectors, it would be facile to conclude that the reaction of the class strongly favors approval of the settlement simply because substantially less than one-tenth of one percent of the merchants have objected.  *But see* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41, at 108 (4th ed. 2002) ("[A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members.  If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-87 (2d Cir. 2001) (holding that "[t]he District Court properly concluded that this small number of objections [18 out of 27,883 notices] weighed in favor of settlement").

I also reject, however, the objectors' argument that the transaction volume they represent means that their objections must weigh heavily *against* approval.  Rather, the reasons

19

advanced by the objectors require careful consideration in the ultimate determination of whether the benefits offered by the settlement create a more attractive alternative to the merchant class than incurring the risks of continued litigation.  For reasons discussed throughout this memorandum, I conclude that the objectors have failed adequately to acknowledge not only the substantial impediments to succeeding on the merits in this case, but also the limitations on the relief that would be available even if success were achieved.  They have also underestimated the significance of the Rule 23(b)(2) relief afforded by the settlement.

Accordingly, I conclude on balance that the reaction of the class favors approval of the proposed settlement.

c.   *The Stage of the Proceedings and the Amount of Discovery Completed*

This factor relates to whether Class Plaintiffs had sufficient information on the merits of the case to enter into a settlement agreement, *Cinelli v. MCS Claim Services, Inc.*, 236 F.R.D. 118, 121 (E.D.N.Y. 2006), and whether the Court has sufficient information to evaluate such a settlement, *Wal-Mart*, 396 F.3d 96, 118.

Before the parties executed the Settlement Agreement, fact discovery had been completed, the parties had exchanged expert reports and deposed the experts, and all dispositive motions had been briefed and argued.  Class Counsel thus had a more than adequate basis for assessing the claims.  *See Wal-Mart*, 396 F.3d at 118 (where several years of discovery, summary judgment and mediation occurred prior to settlement, plaintiffs had a "thorough understanding of their case").  This factor weighs in favor of approval.

d.   *The Risks of Establishing Liability and Damages, and of Maintaining the Class Action through the Trial*

20

"In assessing the Settlement, the Court should balance the benefits afforded the Class, including the *immediacy* and *certainty* of a recovery, against the continuing risks of litigation." *In re Top Tankers, Inc. Sec. Litig.*, 06 CIV. 13761 (CM), 2008 WL 2944620, at *4 (S.D.N.Y. July 31, 2008) (emphasis in original). In this case, the risks of establishing liability and damages at trial, and of maintaining the class throughout the trial (the fourth, fifth, and sixth factors bearing on substantive fairness, respectively) all militate in favor of approval. Indeed, perhaps the most significant defect in the objectors' collective presentation to the Court is the abject failure to acknowledge the perils of *not* settling the case. Instead, the objectors appear to proceed on the assumption that a complete victory on the merits is a foregone conclusion.

A wide range of outstanding issues affects Class Plaintiffs' ultimate likelihood of establishing liability, including the legal characterization of the challenged practices of Visa and MasterCard, and whether those practices on balance would be deemed anticompetitive under the Rule of Reason.[14] Class Plaintiffs allege that a number of core network practices, including the setting of default interchange fees, the Honor-all-Cards rule, and various network rules that discourage merchants from encouraging or requiring consumers to use less expensive payment mechanisms, have resulted in excessively high interchange fees. But proving that those rules

---

[14]    The Rule of Reason is the "accepted standard for testing whether a practice restrains trade" in violation of Section 1 of the Sherman Act. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). As described by the Supreme Court,

> Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. Appropriate factors to take into account include specific information about the relevant business and the restraint's history, nature, and effect. Whether the businesses involved have market power is a further, significant consideration. In its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.

*Id*. at 885-86 (internal quotation marks and citations omitted).

21

violate the antitrust laws is no mean feat.  And even if that feat were accomplished, proving damages is just as difficult.

            i.     *Illinois Brick*

First, there is a threshold problem of standing.  Defendants rely on *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977), in which the Supreme Court held that "indirect purchasers" may not recover antitrust damages.  The Court reasoned that permitting suits by these third parties would essentially transform treble-damages antitrust actions into efforts to apportion the recovery among all potential plaintiffs that might have absorbed part of the illegal overcharge, from direct purchasers to middlemen to ultimate consumers.  However appealing an effort to allocate the overcharge might seem in theory, it would add a dimension of complexity to actions for antitrust damages that would seriously undermine their effectiveness.  *Id.* at 737.

*Illinois Brick* was an action brought by the State of Illinois and local government entities alleging that concrete block manufacturers had engaged in a price-fixing conspiracy.  *Id.* at 726-27. The government entities had contracted with general contractors, who in turn hired masonry subcontractors who bought the concrete blocks for installation in government projects. *Id.* at 735. The Supreme Court held that only a direct purchaser of the concrete blocks (*i.e.*, a masonry subcontractor) was a party "injured in his business or property" by the alleged antitrust violation and thus entitled to sue under Section 1 of the Sherman Act.  *Id.* at 729, 735-37.

The defendants here contend that the merchants lack standing because they are indirect purchasers – the acquiring banks being the direct purchasers – with respect to the interchange fees they allege were fixed.  The objectors argue that the fees are effectively paid by the merchants directly.  The concern about costly and inefficient apportionment proceedings that fueled *Illinois Brick* dissipates where contractual arrangements permit ready determinations of

how an anticompetitive overcharge is allocated along the distribution chain. *Illinois Brick* itself acknowledged a narrow exception to its rule for cases in which the overcharge is passed along via a pre-existing cost-plus contract. 431 U.S. at 736. The plaintiffs here might successfully appeal to such policy considerations; the issuing banks' interchange fees are identifiable and separate from the total package of fees (including other network fees and the acquiring banks' merchant discount fees) that are passed along to the merchants.

On the other hand, the indirect purchaser doctrine is strictly applied, and the exceptions are narrow.[15] In the current posture of the case I need not resolve the issue, but I think it clear that the indirect purchaser doctrine would be a source of significant uncertainty for the plaintiffs if they sought to litigate their claims to a decision on the merits.

ii.    *The Effect of the IPOs*

As stated above, part of the "core conduct" the plaintiffs sought to address was that "Visa and MasterCard member banks [. . .] effectively control the decisions of both Networks" by setting rules and interchange fees for the networks to serve their collective interest. First Consol. Am. Cl. Action Compl., ¶¶ 131-34, DE 317. However, after the filing of that complaint, both Visa and MasterCard came out from under the control of their member banks. The IPOs that accomplished that result strengthened the defendants' argument that they were no longer structural or "walking" conspiracies, and thus that the setting of interchange fees cannot constitute horizontal price-fixing.

iii.    *Default Interchange Rules*

---

[15]    A recent Ninth Circuit opinion, *In re ATM Fee Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012), presents a risk to the plaintiffs' claims. In *ATM Fee*, the court granted summary judgment for the defendant on *Illinois Brick* grounds and rejected three exceptions to the *Illinois Brick* rule that plaintiffs here have relied on in opposition to the defendants' motions for summary judgment: the co-conspirator exception; the ownership-and-control exception; and the exception for cases in which there is "no realistic possibility that direct purchasers will sue." *Id.* at 750-58. Though plaintiffs made arguments at summary judgment to distinguish the *ATM Fee* case, they face a risk that this Court or a higher one would not be persuaded.

The vast majority of the objectors oppose final approval of the Settlement Agreement because it does not require Visa and MasterCard to eliminate their default interchange rules.  But even assuming default interchange fees operate to increase the acceptance costs of Visa and MasterCard credit cards, that does not mean they violate the antitrust laws. The objectors assume that default interchange is inherently illegal, but in reality it is a very complicated issue.

Defendants contend that without default interchange, the costs of Visa and MasterCard credit card transactions would have been higher because of the costs associated with the negotiation of individual interchange agreements.  They further argue that their networks' default interchange rules are procompetitive because they enable issuers to improve card features and rewards and reduce card finance charges and other costs.  And default interchange benefits merchants, the networks argue, by providing consumers greater purchasing incentives, thus increasing consumer demand, which in turn increases merchant sales.  Default interchange also allows the banks that issue credit cards, rather than the merchants that accept them, to assume the costs of fraud and non-payment.

The plaintiffs' experts don't dispute these assertions as much as they argue that they have become obsolete because the Visa and MasterCard networks have "matured" over time.[16]  However, given that these practices are at the core of the defendants' successful business model, it would be difficult for plaintiffs to show that these practices have become antitrust violations by virtue of industry maturation.

---

[16]     *See, e.g.,* Report of Dr. Alan S. Frankel at ¶ 216;  Report of Dr. Christopher A. Vellturo at ¶ 39; Report of Dr. Joseph Stiglitz at ¶¶ 9-10; *see also* Obj. Pls.' Br. at 56 ("Visa and MasterCard have evolved into mature and dominant payment system, and the suggestion that issuing banks need interchange to issue credit cards on which most Americans have become dependent has been untenable for years, if not decades.")

No American court has ever held that Visa or MasterCard's default interchange rules violate the antitrust laws.  In *National Bancard Corporation*, a district court concluded, after a full trial on the merits, that the default interchange rule was "of vital import" to the payment-card system because it relieved issuing and acquiring banks of the need to negotiate potentially thousands of bilateral agreements, and it also assured universal acceptance.  *Nat'l Bancard Corp. v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1259-61 (S.D. Fla. 1984).  The Eleventh Circuit then upheld Visa's default interchange rule.  *Nat'l Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592, 605 (11th Cir. 1986) ("*NaBanco*").  While it is true that the factual underpinning of *NaBanco* – that issuing banks need interchange fees to have adequate incentives to participate in networks – has eroded, a 2008 decision of the Ninth Circuit affirmed the dismissal of challenges aimed at Visa and MasterCard's default interchange rules.  In *Kendall v. Visa U.S.A., Inc.*, the court dismissed the "allegation that the Banks conspired to fix the interchange fee" on the ground that "merely charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act."  518 F.3d 1042, 1048 (9th Cir. 2008).

In short, the default interchange rules played an essential role in the construction of the networks at issue here, and those networks provide substantial benefit to both merchants and consumers.  While the plaintiffs contend that the rules have outlived their procompetitive effects now that the networks have matured, the setting of default interchange fees would almost certainly be evaluated under the Rule of Reason, and the prospect that its anticompetitive effects remain outweighed by its procompetitive ones is real.  DOJ's recent decision not to challenge the default interchange rules despite the entreaties by Class Counsel that it do so further suggests that the plaintiffs' antitrust challenge to the rules could easily fail.

Professor Sykes has advised "that the expected returns to continued litigation are highly uncertain, and that plaintiffs[] face a substantial probability of securing little or no relief at the conclusion of trial." Sykes Report at 3. Specifically, he states that "the plaintiffs face considerable difficulty in establishing . . . that the core practices at issue in the case and left in place by the proposed settlement – such as default interchange and [H]onor[-]all[-C]ards rules – cause anticompetitive harm that outweighs their pro-competitive benefits . . . ." *Id.*

### iv. *The Honor-all-Cards Rules*

A number of objectors argue that the settlement should not be approved because it does not eliminate the networks' Honor-all-Cards rules. As discussed earlier, the Honor-all-Cards rules require merchants that accept Visa and/or MasterCard credit cards to accept all credit cards issued on the same network, regardless of the issuer or the interchange fees associated with the issuer's card.

The Honor-all-Cards rules are closely interrelated in both their history and rationale with the default interchange rules. The assurances that a network's cards will be accepted wherever the network's logo is displayed is critical to customers' desire to carry such cards and to merchants' willingness to accept them.

A number of courts and economists have found the Honor-all-Cards rule and similar rules to be *procompetitive* under the Rule of Reason. The Second Circuit upheld a "blanket license" – a system analogous to the Honor-all-Cards rule – in *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984). *See also* Benjamin Klein et al., *Competition in Two-Sided Markets: The Antitrust Economics of Payment Card Interchange Fees*, 73 ANTITRUST L.J. 571, 592-93 (2006) ("An honor-all-cards rule is the essence of a payment card system because it

assures each cardholder that his card will be accepted at all merchants that display the mark of the card payment system."). As one antitrust practitioner put it:

> [The Honor-all-Cards rule] is a classic example of a restraint that was actually necessary for the functioning of the joint venture. When Visa and MasterCard were formed – think about this: You have thousands of banks across the country issuing these cards, thousands of banks acquiring merchants, millions of merchants accepting these cards – you need to have a seamless acceptance experience. We all take it for granted, but you needed to have a rule that ensured to you, as a consumer, that when you proffer the Visa card, the merchant is going to take it. It's not going to say, "I'll take a Chase Visa card, but I don't like Citibank, so I'm going to turn that one down."

Panel Discussion II: Consumer Issues at 5-6 (Statement of Jeffrey Shinder) (Fordham Univ. Sch. of Law 2008), Marth Decl., Ex. C.

In light of the procompetitive features of the Honor-all-Cards rules, it is no sure thing, to put it mildly, that Class Plaintiffs will be able to prove they have anticompetitive effects to such an extent that they violate the antitrust laws. The proposed settlement preserves the integrity of the rules that made (and continue to make) the networks successful. At the same time, by further relaxing merchant restraints regarding pricing, it provides for transparency and competition at the point of sale. Merchants who choose to use the power the proposed rules changes give them will be able to exercise control over (and perhaps reduce) their costs from accepting Visa and MasterCard credit cards.

          v.     *Damages*

Even if liability is established, Class Plaintiffs would still face the problems and complexities inherent in proving damages to the jury. The plaintiffs' theory of damages would be hotly contested at trial. *See, e.g., In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998) ("[T]he history of antitrust litigation is replete with cases in which

27

antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal."). As Professor Sykes points out, it is very difficult to envision the world that would exist "but for" default interchange fees and the Honor-all-Cards rules. It is not likely that credit card interchange fees would then become zero, and given the greater total costs to users of credit cards as compared to debit cards, it is also unlikely that credit card interchange would be reduced by competition to the level of debit card interchange. Moreover, there is reason to believe that lower interchange fees would make cards less attractive to cardholders (*e.g.*, through higher fees and charges, or reduced rewards). Thus, even if a damage award measured by the reduction in interchange were possible, it might need to be offset by the costs associated with the cards' diminished value to the holders.

These damages-related issues may not be insurmountable, but they are formidable. In addition, as I noted in the *Wal-Mart* case, the Class Plaintiffs would face a practical problem at trial: They would be asking jurors who feel they had absorbed in the past the cost of anticompetitive interchange fees through higher prices at the checkout counter to award extravagant damages that they would absorb in the future through higher bank fees. Jurors have great common sense. They would conclude with justification that they, not the merchants, were the ultimate victims of any antitrust violations they found to have occurred, and they would be naturally reluctant to victimize themselves yet again by awarding significant damages against the networks and the defendant banks.

The various risks of establishing damages weigh strongly in favor of approving the settlement.

vi.    *Maintaining Class Status*

Finally, Class Plaintiffs face the risk that the classes would not be certified or that certification would be modified as the litigation continued.  Class Plaintiffs' motion to certify Rule 23(b)(2) and (b)(3) classes is pending.  A number of objecting class members voice the hurdles that Class Plaintiffs would have to overcome to maintain class certification.  Though Class Plaintiffs have strong arguments that the classes should be certified, I note that the certification of a similar class in the *Wal-Mart* case was affirmed only over a vigorous dissent, *see Wal-Mart*, 280 F.3d at 147 (Jacobs, J., dissenting), and the legal landscape in which class certification is litigated has deteriorated for plaintiffs in the intervening period.  *See, e.g., In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006) (overruling the more lenient "some showing" standard of *Caridad v. Metro–North Commuter Railroad*, 191 F.3d 283, 293 (2d Cir. 1999)); *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) (reversing class certification in antitrust case based on an inadequate damages model).  The risks associated with the certification of classes weigh in favor of settlement.

> e.    *The Ability of Defendants to Withstand a Greater Judgment*

Class Plaintiffs did not address this *Grinnell* factor, stating that the fact that the defendants would be able to pay a substantial judgment does not counsel against approval of an otherwise fair settlement.  The objectors note that there is no risk that Visa and MasterCard and the bank defendants would become insolvent.  I agree that these defendants could withstand a greater judgment, and thus this factor does not weigh in favor of approval.

> f.    *The Range of Reasonableness of the Settlement Fund in Light of the Possible Recovery and Attendant Risks of Litigation*

The objectors argue that Class Plaintiffs should have insisted on a cash payment closer to their expert's damages projection.  But the argument ignores the many factors that make a jury award consistent with that projection – nearly a trillion dollars after trebling –

29

extraordinarily unlikely.  The estimated $7.25 billion that defendants have agreed to pay represents approximately 2.5% of total interchange fees paid by class members during the class period, and thus 2.5% of the largest possible estimate of actual damage to merchants.

       The damages provided by the proposed settlement are within the range of reasonableness in light of the best possible recovery and in light of all the attendant risks of litigation.  The settlement proceeds establish a guaranteed fund worth approximately $7.25 billion (before reductions for opt-outs), the largest-ever cash settlement in an antitrust class action.  Class Plaintiffs' expert estimates that the ability to surcharge could save merchants between $26.4 and $62.8 billion in acceptance costs over the next decade.  Frankel Decl., ¶¶ 67-73, DE 2111-5.  The agreement provides for substantial payments to the class members now rather than leaving them with the prospect of uncertain relief later.  The settlement amount compares favorably with settlements reached in other antitrust class actions, especially given the lack of prior governmental investigation and the disparity between the parties' damages calculations.  *See, e.g., In re Currency Conversion Fee Antitrust Litig.,* 263 F.R.D. 110, 123 (S.D.N.Y. 2009) (settlement of $336 million and injunctive relief "represent an extraordinarily significant recovery" in light of the fact that "Plaintiffs did not have the benefit of a Government investigation"), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010); *NASDAQ*, 187 F.R.D. at 478 (antitrust settlement of $1.027 billion approved where plaintiffs' and defendants' damages estimates were vastly disparate).

       The objectors' complaint that the proposed settlement does not achieve everything the plaintiffs sought at the outset of litigation does not tip this factor in their favor.  As the Second Circuit observed in *Grinnell*:

> The fact that a proposed settlement may only amount to a fraction
> of the potential recovery does not, in and of itself, mean that the

> proposed settlement is grossly inadequate and should be disapproved.  In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.

495 F.2d at 455 & n.2.

I conclude that the Settlement Agreement is both procedurally and substantively fair.

D. *The Objections*

As noted, there are numerous objections to the settlement.  I discuss the principal ones below.

1. *Rule Reforms*

a. *The Elimination of the Networks' No-Surcharge Rules*

One of the principal accomplishments of the injunctive relief obtained by the proposed settlement is the elimination, both at the network and product levels, of the rule prohibiting surcharging by merchants.  The proponents of the settlement tout this change as a significant achievement; the objectors claim it is essentially worthless.  The various facets of the objectors' position are addressed in detail below, but I find their position to be largely unpersuasive.  It is true that the value of surcharging to merchants is diminished by certain factors, some of which are beyond the reach of this lawsuit.  It is also true that many merchants, for reasons sufficient to them, may choose not to avail themselves of the right to surcharge.  Nevertheless, I find that this rule change, which the Class Plaintiffs and the Individual Plaintiffs fought very hard to obtain, is an indisputably procompetitive development that has the potential to alter the very core of the problem this lawsuit was brought to challenge.  At most, the objectors' arguments establish that the *entire* solution to that problem constitutes a mosaic, of which the right to surcharge (like the other forms of relief in the proposed settlement) is but one

piece.  But it is a central piece – a critical accomplishment – and the fact of the matter is that an entire solution to the problem would be unattainable in this action even if it were litigated to its final conclusion and (against considerable odds) plaintiffs prevailed on all of their claims.

The Class Plaintiffs, the Individual Plaintiffs, and the objectors agree that the combined effect of the various rules challenged in this lawsuit is supracompetititve interchange fees on Visa and MasterCard credit cards.  The rules work together to prevent inter-brand competition between each network's cards at the point of sale.  If a customer presents a Visa card for payment, the Honor-all-Cards rule requires the merchant to accept it (unless the merchant chooses not to accept *any* Visa credit cards, an unlikely option given their ubiquity).  The no-surcharge rule further prohibits the merchant from steering the customer to a competing MasterCard credit card with a lower interchange rate by surcharging the higher-priced Visa card. The allegedly supracompetitive interchange rate on the Visa card is hidden by the combined effects of the rules and the merchant is forced to pay it.

The same is true with respect to different kinds of cards within each network. Premium cards carry higher interchange fees.  Merchants who want to steer customers away from a higher-interchange MasterCard credit card to a different MasterCard card with a lower rate by imposing a surcharge on the former are prohibited from doing so.

The proposed elimination of the no-surcharge rules finally would allow merchants to make transparent and avoidable what has been opaque and inevitable.  Customers can be told what it costs the merchant to accept a particular card.  Merchants can use their ability to disfavor one network at the point of sale by surcharging.  That power will incentivize both networks to moderate or lower their interchange fees to avoid being disfavored.  The customer can then choose between using the premium card that is subject to a surcharge (she may value the rewards

of the high-cost card more than a lower purchase price) or being steered to a lower-cost card and paying less for the transaction.

The ability to surcharge allows merchants to recoup the higher acceptance costs of the expensive cards.  It allows them to steer customers to less costly cards or to other payment mechanisms, decreasing their card-acceptance costs.  It allows market forces to operate on the previously invisible (to customers) array of interchange fees, and will exert downward pressure on those fees by injecting a form of competition the current rules have prohibited.

The objectors make a number of arguments in support of their overall claim that the proposed rules changes that will allow surcharging is essentially worthless.  Some are more persuasive than others, but they do not in my view alter the fact that the rule change would be a significant achievement for the class.

First, objectors contend that surcharging is prohibited by law in ten states.  Thus, merchants who do business only in those states[17] contend that this aspect of the settlement will be useless to them.  I disagree for several reasons.  One is that interchange fees are set on a nationwide basis.  Thus, surcharging (or the threat of surcharging) by merchants in the states where it is permitted may well inure to the benefit of merchants in those ten states.  Also, there is reason to believe that at least some state laws are enforced in a manner that prohibits surcharging only when the merchant fails to sufficiently disclose the increased prices for credit card use.

---

[17]    Certain national or multistate merchant objectors argue that they will not be able to surcharge *anywhere* if they have even one store located in a state that prohibits surcharging.  There is no support for this contention.  The Settlement Agreement does not contain any such prohibition and the Class Notice, which defendants consented to, states the opposite:

> . . . the fact that a merchant's ability to surcharge may be restricted under the laws of one or more states is not intended to limit the merchant's ability under the settlement to surcharge Visa or MasterCard credit cards where permitted by state law.

Notice at 8.

More importantly, things change, and there is reason to believe that these state-law impediments to a full deployment of the proposed relief will eventually be among them.  No-surcharge laws are not only anti-consumer, they are arguably irrational, and indeed one of them – New York's – has bitten the dust in the brief interval since the fairness hearing.  *Expressions Hair Design v. Schneiderman*, 13 CIV. 3775 JSR, --- F.Supp.2d ---, 2013 WL 5477607 (S.D.N.Y. Oct. 3, 2013).

The plaintiffs in *Expressions Hair Design* were five New York retailers and their principals.  They challenged New York General Business Law § 518, which prohibits a merchant from imposing a surcharge when a consumer elects to pay with a credit card.[18]  As Judge Rakoff observed, the proposed settlement's elimination of the no-surcharge rule, which has already become effective, gave the "previously redundant" state no-surcharge law "renewed importance."  *Id.* at *4.  The retailer plaintiffs wanted to surcharge credit card transactions because of the two-to-three percent cost per transaction.  "They [did] not want to frame this price difference as a cash discount" because it wasn't, and calling it a discount would make the advertised prices seem higher than they really were "without making it transparent that the higher price would be due solely to credit card transaction costs -- precisely the information [they] wish to convey to [their] consumers."  *Id.* at *5 (internal quotation marks omitted; some alterations in original).  Inspired by the rules change already in effect because of the proposed settlement, the plaintiff merchants wanted to post a sign telling customers of a 3% surcharge due

---

[18]    The section reads in full as follows:

No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means.

Any seller who violates the provisions of this section shall be guilty of a misdemeanor punishable by a fine not to exceed five hundred dollars or a term of imprisonment up to one year, or both.

N.Y. Gen. Bus. Law § 518.

to high interchange fees.  However, fearful of prosecution under § 518, they sought a preliminary injunction precluding enforcement of § 518 against them on First Amendment and vagueness grounds.

In granting that relief, Judge Rakoff observed that "*Alice in Wonderland* has nothing on" New York's no-surcharging law. In rejecting the state's attempt to defend the statute as pro-consumer, he wrote that

> the statute actually perpetuates consumer confusion by preventing sellers from using the most effective means at their disposal to educate consumers about the true costs of credit-card usage.  It would be perverse to conclude that a statute that keeps consumers in the dark about avoidable additional costs somehow "directly advances" the goal of preventing consumer deception."

*Expressions Hair Design*, 2013 WL 5477607 at *11.

Citing the "undeniable" public interest in full access to the information about the costs of credit card acceptance, the "critical" nature of that information to the millions of payment decisions made each day, and the fact that no-surcharge rules have the effect of artificially subsidizing credit at the expense of other payment methods, Judge Rakoff preliminarily enjoined "a surcharge ban indistinguishable from the bans that Visa and MasterCard recently dropped from their retailer contracts as part of [the instant proposed] antitrust settlement." *Id*. at *15, *14.

Nine other such state laws remain.  The validity of those laws is not before me, but I have no reason to doubt Judge Rakoff's assessment that they "were enacted in the name of consumer protection at the behest of the credit-card industry over the objection of consumer advocates." *Id*. at *14.  Will those laws diminish, at least in the near term, the efficacy of the proposed relief here?  Of course.  But Class Counsel and counsel for the Individual Plaintiffs have good reason to believe that further efforts, whether they take place in courts or legislatures,

will successfully address that problem.  Those state laws, properly understood, hurt the very

consumers they were ostensibly enacted to protect by propping up high credit card acceptance

costs.  They aid and abet a regime in which the poorest consumers subsidize the awards

conferred upon premium cardholders because merchants are prohibited from disfavoring those

premium cards through surcharging.

   The objectors also contend that the elimination of the no-surcharge rule is

rendered useless by what all parties have termed the "level-playing-field" provision, which

conditions a merchant's ability to surcharge a Visa or MasterCard credit card on a requirement

that it also surcharge other payment products of equal or greater cost of acceptance.[19]  Since

many merchants accept American Express, which carries an even higher cost acceptance, and the

American Express rules prohibit surcharging, most merchants will, as a practical matter, be

precluded from surcharging Visa and MasterCard products.

   I note preliminarily that the mere fact that merchants may *choose* not to avail

themselves of the proposed relief (*i.e.*, by continuing to accept American Express) does not

compel the conclusion that the indisputably procompetitive rules changes are not a valuable

achievement.  But putting that aside, this objection, like many of the objectors' claims, places in

---

[19]   Visa's "level-playing-field" provisions reads as follows:

   If a merchant's ability to surcharge any Competitive Credit Card Brand that the merchant accepts in a channel of commerce (either face-to-face or not face-to-face) is limited in any manner by that Competitive Credit Card Brand, other than by prohibiting a surcharge greater than the Competitive Credit Card Brand's Cost of Acceptance, then the merchant may surcharge Visa Credit Card Transactions, consistent with the other terms of this Paragraph 42(a), only on either the same conditions on which the merchant would be allowed to surcharge transactions of that Competitive Credit Card Brand in the same channel of commerce, or on the terms on which the merchant actually does surcharge transactions of that Competitive Credit Card Brand in the same channel of commerce, after accounting for any discounts or rebates offered at the point of sale;

SA ¶ 42(a)(iv).  MasterCard's, *id*. ¶ 55(a)(iv), is substantially identical.

sharp relief the limited extent to which the problems merchants complain about in this industry can be addressed in a single lawsuit. Just as anti-consumer state laws may, at least in the short term, undermine the relief proposed here, so may the merchant restraints imposed by American Express. The mere fact that American Express, through rules similar to those challenged here, may continue to engage in what the objectors would describe as anticompetitive conduct is hardly an indictment of the proposed settlement before me. The merchants who support the proposed settlement are fully justified in the view that "the American Express problem" is not only a problem that must be (and in fact is being) addressed elsewhere, but that isolating American Express as the only remaining major network insulated from price competition will assist in the effort to "fix" it. In any event, the problem posed by American Express's merchant restraints does not alter the fact that the essence of the injunctive relief obtained by the proposed settlement will permit procompetitive actions by merchants at the point of sale, and that those actions have the potential to ameliorate the precise anticompetitive effect – supracompetitive interchange fees – that these lawsuits were brought to challenge. Tellingly, the objectors, for all their reliance on the "American Express problem" in opposing the proposed settlement, have no solution for that problem. That is no doubt because there could not be one in this case.

The objecting merchants' complaints regarding the proposed settlement's requirement that merchants disclose surcharges at the point of entry, at the point of sale, and on the sales or transaction receipt are without merit. Such disclosure requirements promote pricing transparency by informing consumers of the charges they will face if they use a particular form of payment. It will no longer be a hidden tax imposed on consumers. Merchants can now educate them about of the costs of their different payment products.

37

Lastly, the objectors' concerns regarding merchants' ability to understand and implement surcharging are misplaced. Essentially, the new surcharge system has four elements:

- Merchants may surcharge the full average discount fee incurred (as determined by the prior month or last 12 months);

- Merchants may surcharge brand-wide (*e.g.,* all Visa or MasterCard credit cards), or they employ a more nuanced strategy and impose surcharges on one or more product groups (*e.g.,* Visa Signature cards or MasterCard World Elite cards, which carry higher fees for many merchants);

- Merchants must disclose to consumers that the surcharge does not exceed the merchant's cost of acceptance, and disclose the amount of the surcharge both before it is incurred and on a receipt; and

- If another more expensive network brand that the merchant accepts continues to restrict surcharging, the merchant may not surcharge Visa and MasterCard without also surcharging transactions on that competitor network. This is the "level-playing-field" provision.

It is true that many merchants are unsophisticated, but I am confident that, with the assistance of Class Counsel, they will be able to understand their newfound right to surcharge. Pls.' Reply Mem. in Supp. Mot. Final Approval 34, DE 5939.

b. *The Buying Group Provision*

The objectors argue that the group-buying and all-outlets provisions will not provide them a benefit because they will not take advantage of them, or that the relief is illusory because Visa and MasterCard rules did not previously prohibit merchants from engaging in joint negotiations. Though there were no rules that prohibited buying groups, it was the practice of both Visa and MasterCard to refuse to negotiate over interchange fees with merchant buying groups or other groups of merchants. Allowing groups of merchants to join together to negotiate with Visa and MasterCard empowers merchants in their dealings with the networks by allowing them to bargain collectively.

In sum, there is no history of negotiations between Visa and buying groups, or between MasterCard and buying groups.  Now there is an affirmative obligation on the part of each network to negotiate in "good faith" with such groups.  This feature of the proposed settlement constitutes a meaningful reform that is favorable to merchants.

2.  *The Releases*

The Settlement Agreement includes a release for each of the two classes.  Set forth in paragraphs 33 and 68 of the Settlement Agreement, respectively, the so-called (b)(3) and (b)(2) releases have drawn numerous objections.  The objectors assert that, among other problems, the releases cover a "virtually limitless range of claims," providing Visa and MasterCard with "immunity" from all future merchant claims, including antitrust claims, and therefore should be deemed void as against public policy.  Obj. Plaintiff's Br. at 3-4, DE 1678.  Others have grounded similar objections in fundamental notions of due process.  However, because the releases cover only the claims that may properly be extinguished by the settlement of a class action, I reject these objections.

Both releases cover claims that are or could have been alleged in this case.  Such releases are permissible, *see Wal-Mart*, 396 F.3d at 106-13, and indeed the ability to include them in class action settlements is essential to providing defendants the litigation peace they legitimately expect in return for the settlement of claims.  The full array of future claims embraced by such a release necessarily involves a measure of uncertainty, but the Second Circuit has clearly established the rule of decision:  "The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual

39

predicate as the settled conduct.'"  *Id.* at 107 (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)).

The most vehement of the objections to the release share two related flaws.  First, they assume the unlawfulness of both the default interchange and Honor-all-Cards rules, and object to the release of future challenges to those rules.  However, as discussed above, the anticompetitive character of these rules is far from clear, and the Class Plaintiffs would have a difficult time proving it here.  Armed with both the Class Plaintiffs' evidence and legal theories, the Department of Justice chose not to challenge either rule when it investigated and proceeded against Visa and MasterCard.  In any event, because the illegality of those rules is at a minimum an unsettled question, future challenges to them could properly be released even in the absence of the alterations to the networks' practices discussed in the following paragraph.  *See, e.g., Robertson v. Nat'l Basketball Ass'n*, 556 F.2d 682, 686 (2d Cir. 1977).

Second, the objections fail to take sufficient account of the alterations accomplished directly by the proposed settlement and indirectly during the course of this litigation.  As discussed above, in a post-settlement world, (1) merchants will be allowed to surcharge (subject to the limitations discussed above) Visa and MasterCard credit cards at both the brand and product levels; (2) merchants will be able to discount credit and debit transactions; (3) the reforms achieved by the Durbin Amendment and of the Department of Justice lawsuit will be preserved by agreement; and (4) Visa and MasterCard will be obligated to negotiate interchange fees in good faith with merchant groups.  Even if the objectors are correct that default interchange and the Honor-all-Cards rule produce anticompetitive effects, the rules reforms achieved by the settlement have the potential to meaningfully blunt those effects.  In exchange for a new, going-forward rules structure, the defendants are entitled to bargain for and

receive releases of claims that are or could have been alleged based on the identical factual predicate of the claims in this case.

That is all these releases accomplish. They do not release the defendants from liability for claims based on new rules or new conduct or a reversion to the pre-settlement rules. They appropriately limit future damages claims based on the pre-settlement conduct of the networks.

There is no due process right to opt out of the (b)(2) class, as some objectors argue. Rule 23 contemplates binding settlements with no opt-out rights where the injunctive relief achieved by the settlement is appropriate for the class as a whole. The (b)(2) settlement here is limited to going-forward injunctive relief that changes the structure of the networks' practices. If merchants could opt out of the (b)(2) class, they would reap the benefits of that relief anyway, as the injunctive relief is generally applicable to all merchants. To allow them to opt out and pursue their own rules-based injunctive relief would eliminate the incentive to settle that Rule 23(b)(2) was designed in part to create. "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011) (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.REV. 97, at 132 (2009)). That is precisely the case with respect to the claims in this case that seek injunctive relief from the bundle of network rules that result in – according to the plaintiffs' allegations – supracompetitive interchange fees in violation of the antitrust laws. Accordingly, the aspect of the settlement that resolves those claims by neutralizing that bundle of rules is the proper subject of a (b)(2) class from which no opt-outs are permitted.

41

That the release extends to future challenges to the reformulated rules or "substantially similar" ones does not create the giant loophole multiple objectors fear. If the networks make non-substantive changes to the post-release rules and related conduct, there will be no reason for the release not to operate. Other changes are not subject to the release. Is there room for litigation over whether future rules are "substantially similar?" Of course, but that is no reason to prohibit the networks from making *any* rules changes, no matter how unrelated they may be to the claims and conduct at issue here, on pain of losing the protection of an otherwise lawful release.

I need not and cannot catalog here all the claims that fall within or without the release. It suffices to say that the releases do not cover new, future anticompetitive conduct and rules.

One of the many indicia of how ubiquitous the Visa and MasterCard credit products have become is the fact that American Express, Discover and First Data Corporation (which provides services, including equipment, to merchants), and Cardtronics (an ATM operator) are also members of the merchant class. They object to the release of claims they may have against Visa and MasterCard, which are among their competitors. These objectors seek to make something of nothing; it is sufficiently clear from both the text and context of the releases that these class members are releasing only claims that merchants have alleged or could have alleged in this case in their capacity as merchants. The release does not bar claims that a class member may have in its capacity as a payment-card competitor, an ATM operator, or any other capacity other than as a merchant that accepts Visa and MasterCard credit cards.

3.    *The Health Insurers' Objections*

Two health insurance objectors, The Wellpoint, Inc. and the Blue Cross Blue Shield Entities object to the settlement on the basis that certain provisions of the Patient Protection and Affordable Care Act of 2010 ("Affordable Care Act") could cause the settlement to affect them differently than other merchants. *See* Wellpoint Obj. ¶¶ 2-11, DE 2493-2; Blue Cross Obj. 9-14, DE 2643. The provision that causes the health insurance objectors concern is the medical loss ratio regulation. Specifically, they argue that a provision of the Affordable Care Act that limits the amounts insurers can spend on non-health related activities could result in an increased risk of having to pay certain rebates to customers. *See* Wellpoint Obj. ¶3; Blue Cross Obj. 9-14. The regulation "provides that for policies purchased by individuals as opposed to by employers or groups, at least 80 percent of premium revenues have to be spent on either clinical services or healthcare quality improvement activities." Tr. 160:6-10. If health insurers do not meet this 80 percent payment, they are subject to a penalty (*i.e.*, rebate payments). Payment card fees, such as interchange fees, are neither clinical care nor healthcare quality improvement activities. Therefore, the argument goes, paying those fees will count against health insurers as they strive to comply with the 80 percent threshold requirement.

I agree with these objectors that no one thought of their unique concern in formulating the settlement, but that is no reason not to approve it. The notion that interchange fees may cause health insurers to cross to the wrong side of that 80% threshold is entirely speculative.

4.    *Claims by States Acting in their Sovereign Capacity*

State Attorneys General object that because state governmental entities may accept Visa or MasterCard cards for payment, the releases might bar "claims that are uniquely and exclusively claims belonging to the States as sovereigns," specifically "state law

43

enforcement or *parens patriae* claims," including *parens patriae* claims for fines, civil, or other penalties.  State Obj. at 2, DE 2623.

   As discussed above, the releases extend only to claims that are alleged or which could have been alleged in this case.  Thus, the settlement resolves claims made by persons, businesses, and other entities that "arise from or relate to their capacity as merchants that accept Visa-Branded Cards and/or MasterCard-Branded Cards in the United States . . . ."  Revised Class Notice at F2-12, DE 1740-2.  Therefore, claims brought by States to vindicate interests in their sovereign capacity are not barred by the release.  Pls.' Reply Mem. in Supp. Mot. Final Approval 84; Defs.' Br. at 34.

   Defendants have noted that while the releases do not extend to *parens patriae* claims that States assert in their sovereign capacity, the releases bar claims that States may assert in a representative capacity on behalf of state resident that are members of the Rule 23(b)(2) or (b)(3) settlement class.  States may assert *parens patriae* claims in a representative capacity for injuries to the interests of state residents when specifically authorized by a federal or state statute.  *See e.g.,* 15 U.S.C. § 15c; Cal. Bus.  Prof. Code § 16760; 740 Ill. Comp. Stat. 10/7.  In such an action, the State's claim is derivative of the state resident's claim, and may be barred where the resident's claim is barred.

   To resolve the concerns raised by state attorneys general, taking into consideration the distinction between a state acting in its sovereign or quasi-sovereign capacity and a state acting in its representative capacity, defendants have proposed the following provision be added:

> The Definitive Class Settlement Agreement and this Class Settlement Order and Final Judgment do not bar an investigation or action, whether denominated as *parens patriae*, law enforcement, or regulatory, by a state, quasi-state, or local governmental entity

> to vindicate sovereign or quasi-sovereign interests. The Definitive Class Settlement Agreement and this Class Settlement Order and Final Judgment bar a claim brought by a state, quasi-state, or local governmental entity's proprietary interest (a) as a member of the Rule 23(b)(2) Settlement Class, or (b) as a member of the Rule 23(b)(3) Settlement Class that has received or is entitled to receive a financial recovery in this action. The Definitive Class Settlement Agreement and this Class Settlement Order and Final Judgment also bar a claim, whether denominated as seeking damages, restitution unjust enrichment, or other monetary relief, brought by a state, quasi-state, or local governmental entity for monetary harm sustained by natural persons, businesses, or other non-state, non-quasi-state, and non-local governmental entities or private parties who themselves (a) are members of the Rule 23(b)(2) Settlement Class or (b) are members of the Rule 23(b)(3) Settlement Class.

Sept. 9, 2013 Letter from Defs. at 2 (August 21 Proviso), DE 5995.

To clarify the releases as they bear on states acting in their sovereign capacities, I adopt that language, which shall be incorporated into the final settlement order and judgment.

5.    *Discover's Objection*

Discover argues that the level-playing-field provision that cabins merchants' ability to surcharge affects its network in unfair and competitively harmful ways. Specifically, Discover requests that the Court reject the settlement because its "Equal Treatment Rule" will be harmed by that provision. However, to the extent that Discover cards are lower-priced than Visa and MasterCard products, Discover will not be affected by the level-playing-field provision. Its claim that in "some situations" its Equal Treatment Rule may preclude surcharges against Visa and MasterCard is not a reason to reject the Settlement Agreement.

6.    *The Notice to Class*

Certain objectors argue that the notice sent to the class contains "false statements' that render it inadequate. These false statements include: (1) attributing certain rule changes, "namely the no-discounting and $10-minimum rules for credit transactions," to the proposed settlement, when the changes predated the settlement; (2) the notice stated that the release covers

"other fees" and "other rules," when it covers every merchant fee and all of Visa's and MasterCard's rules and unwritten rules and practices; and (3) the notice fails to inform class members that "the surcharging relief will be unavailable to the majority of merchants and transactions . . . ."  Obj. Pls.' Br at 63.

The notice here meets the requirements of due process and notice standards.  It described the litigation, summarized the settlement's terms, quoted the releases verbatim, described the request for attorneys' fees, expenses, and incentive awards for Class Plaintiffs, and explained the deadline and procedure for filing objections to the settlement as well as opting out of the case settlement class.  The objectors' complaints provide no reason to conclude that the purposes and requirements of a notice to a class were not met here.

There is no showing that the notice did not meet this standard.

7.    *Cohesiveness of the Rule 23(b)(2) Class; Adequacy of Class Plaintiffs*

Some of the objectors contend that the Rule (b)(2) class is not cohesive.  I disagree.

A Rule 23(b)(2) class is warranted when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The network rules regimes that gave rise to this case applied generally to every merchant accepting Visa or MasterCard credit cards, and the injunctive relief in the proposed settlement does as well.  Specifically, all merchants have the same interest in being able to inform cardholders at the point of sale of the acceptance costs of their credit cards and to either steer them to lower-cost alternatives or recoup the cost of acceptance.

In fact, by focusing the settlement efforts on the merchant restraints, as opposed to, for example, default interchange (which many objectors assert should have been the focus), Class Plaintiffs have enhanced the cohesion of the class.  Even if judicial regulation of default interchange fees were within the reach of the plaintiffs in this action, any such regulation would affect the class unequally.  As mentioned above, default interchange operates only in the absence of bilateral agreement, and some of the very large merchants have sufficient transaction volume that they can actually negotiate for their own, lower interchange structures.  By ending a specific merchant restraint that prohibits point-of-sale, competition-enhancing actions, every single merchant that elects to avail itself of the new rules changes will have received the same benefit.  And because that benefit redesigns the relationship between the each merchant and the networks in precisely the same manner, the structural relief is generally applicable to the class in the manner required by Rule 23(b)(2).  The fact that some merchants may elect not to avail themselves of the rule, or are prohibited by factors beyond the scope of this lawsuit from surcharging, does not undermine my conclusion that the class is sufficiently cohesive to warrant Rule 23(b)(2) relief in this case.

In addition, the Class Plaintiffs adequately represent both the (b)(2) and the (b)(3) settlement classes.  As discussed above, the interests of the Class Plaintiffs and the rest of the (b)(2) class are not antagonistic.  In addition, the Class Plaintiffs have been involved in this action from the outset and have fulfilled all of the obligations associated with being class representatives.  They have participated in discovery, in mediation, in court sessions, in the evaluation of the mediators' proposals, and in the formulation of the Settlement Agreement.[20]

---

[20]    The other requirements for certification of settlement classes under Rule 23 have not been the principal focus of objection, and they are easily met here.  Both the (b)(2) and (b)(3) classes contain several million merchants, satisfying numerosity.  Commonality is satisfied because, for both classes, key questions of law and fact – the application of the antitrust laws to uniform Visa and MasterCard policies – are common.  Common *answers* to

47

E.  *The Plan of Allocation*

"As a general rule, the adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and reasonable" under the particular circumstances of the case. *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) (internal quotation marks omitted).  Whether the allocation plan is equitable is "squarely within the discretion of the

---

those questions are inevitable, *see Dukes*, 131 S.Ct. at 2551, since the questions focus on the application of law to the defendants' conduct (which was essentially the same toward all class members), not on the individual conduct of many different plaintiffs.  For similar reasons, typicality is satisfied, since "the named Plaintiffs' claims are for the same type of injury under the same legal theory as the rest of the class." *Reid v. SuperShuttle, International, Inc.*, 2012 WL 3288816, at *4 (E.D.N.Y. Aug. 10, 2012).  Adequacy, as discussed above, is also met here.

Each class also satisfies its respective subsection of Rule 23(b).

Because all the members of the injunctive relief class were subject to the same rules, and because the relief afforded by that class is a change to those rules, the class satisfies the requirement that defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  As discussed above, the rules reforms created by the settlement – in particular, the ability for merchants to surcharge – affect all (b)(2) class members equally.

The damages class satisfies Rule 23(b)(3)'s predominance and superiority requirements.  As discussed under Rule 23(a), the key issues for the damages class relate to defendants' conduct, and those issues vastly outweigh – that is, predominate over – any relevant legal or factual determinations that vary among the plaintiffs.  It is true that individual differences exist in the class – for example, the ability of a few large merchants to negotiate their own interchange fees.  But in the main, differences among the (b)(3) class members go to the conceivable monetary recovery, not liability, and two aspects of the settlement mitigate concerns about individual damages issues.  First, those (b)(3) class members who believe they may do better on their own are permitted to opt out, and many have done so.  As discussed above, many of the opt-outs are very large, sophisticated businesses, and they are competent to protect their own interests.  The monetary settlement here does not harm them (and, to the extent it establishes a precedent, probably helps them in their individual suits or negotiations).  Second, for those class members who have not opted out, the fact of the settlement is "relevant," *see Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619 (1997), since it creates a single method and procedure for recovering monetary claims that might otherwise be complex and individualized.  And of course, it is well-established that "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."  *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 139.

The settlement's relevance is obvious for the superiority determination as well.  This settlement is not perfect; as I noted above, one lawsuit cannot possibly address every party's concerns about interchange fees and the networks' rules.  But for the purpose of remedying the plaintiffs' damages claims flowing from the defendants' alleged antitrust violations, it's hard to imagine a better alternative than a single, uniform claims procedure.  Absent certification, there would be no settlement, which would likely mean many fragmented lawsuits; that would risk inconsistent results and place a huge litigation burden on the defendants.  It is also likely that, for the many smaller merchants that constitute the overwhelming majority of the class, the *realistic* alternative to certification is no case at all, given the costs, risks, and range of recovery available in litigation.  *Cf. Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).  In sum, common issues predominate and class treatment is superior because (b)(3) class is "sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.

Thus, both classes meet the requirements of Rule 23, and certification is proper.

district court." *In re PaineWebber*, 171 F.R.D. at 132. I find that the plan is both fair and reasonable, and thus I approve it.

The plan works as follows. The Class Administrator will distribute the $6.05 billion Cash Fund to Authorized Cash Claimants, on a pro rata basis, depending on the amount of actual or estimated interchange fees they paid during the class period. (Plan of Administration and Distribution at SA Appendix I.) Payments to Authorized Interchange Claimants from the estimated $1.2 billion Default Interchange Payments Fund will be made pro rata, and will be based on one-tenth of one percent of the claimant's Visa and MasterCard transactions during the eight-month period as compared to total of all claim values for that fund. The amount of interchange fees paid by each authorized cash claimant will be determined or estimated from data obtained by Class Counsel from Visa, MasterCard, the bank defendants, non-defendant acquiring banks and independent service organizations subpoenaed by Class Counsel, and from the Authorized Cash Claimants themselves. (*Id.* at I-2).

There have been no substantive objections to the allocation plan except for a speculative objection from Ace Hardware that I find to be without merit.

I conclude that this plan of allocation, which is recommended by experienced and competent counsel, is fair, reasonable, and adequate. This conclusion is buttressed by the relatively small number of opt-outs and absence of objections from class members. Accordingly, I approve as final the allocation plan.

CONCLUSION

For the reasons stated above, the proposed settlement is approved with the minor modification set forth above.  A status conference regarding the next steps in the case shall be held on January 10, 2014 at 3:00 P.M.

So ordered.

John Gleeson, U.S.D.J.

Dated: December 13, 2013
       Brooklyn, New York

50